UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| KORY WHITE,<br><br>Plaintiff,<br><br>v.<br><br>RON NEAL, et al.,<br><br>Defendants. | CAUSE NO. 3:24-CV-53-PPS |

OPINION AND ORDER

Kory A. White, a prisoner without a lawyer, brings two claims related to a fire that occurred at Indiana State Prison ("ISP") on January 14, 2023. First, he is proceeding against Officer Kevin Cross, Lieutenant Nadine Smith-Robinson, Officer Darnell Crockett, Sergeant Jeniene Walton, Lieutenant Dennis Koen, Case Worker Jacqueline Mayes, and Dr. Christina Chico "in their personal capacity for money damages for denying him medical care for injuries he suffered in a January 2023 fire in violation of the Eighth Amendment[.]" ECF 23 at 11. Second, he is proceeding against Commissioner Christina Reagle, Warden Ron Neal, Assistant Warden Dawn Buss, Major Douglas Wardlow, Supervisor of Fire Training Gordon Beecher, and Safety Hazard Manager Deborah Taylor "in their personal capacity for monetary damages for deliberate indifference to the risk of harm posed by a fire that occurred in January 2023 in violation of the Eighth Amendment[.]" *Id*. For simplicity's sake, I will refer to these defendants collectively as the "state defendants". The state defendants filed a joint motion for summary judgment, which is fully briefed. ECF 127, 135, 136, 141, 142, 153,

159. Dr. Chico filed a separate motion for summary judgment, which is likewise fully briefed. ECF 130, 131, 133, 143, 144, 146, 147.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, I must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). I will not "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). My sole task at this stage of the case is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770. If a reasonable factfinder could find in favor of the nonmoving party, summary judgment may not be granted. *Id.*

I will address the state defendants' summary judgment motion first and then turn to Dr. Chico's summary judgment motion.

## I. State Defendants

White is proceeding against the state defendants on two claims. First, he is proceeding against one group of state defendants who were physically present for and actively involved in responding to the January 14 fire – Officer Cross, Lt. Smith-Robinson, Officer Crockett, Sgt. Walton, Lt. Koen, and Case Worker Mayes (collectively, the "incident defendants") – for denying him medical care for injuries he suffered during the January 14 fire. ECF 23 at 11. Second, he is proceeding against another group of state defendants who are supervisory officials at ISP – Commissioner Reagle, Warden Neal, Assistant Warden Buss, Major Wardlow, Supervisor of Fire Training Beecher, and Safety Hazard Manager Taylor (collectively, the "supervisory defendants") – for deliberate indifference to the risk of fire at ISP. Each claim will be addressed in turn.

### *a. Incident Defendants*

White is proceeding against the incident defendants for denying him medical care for injuries he suffered during the January 14 fire. Viewed in the light most favorable to White, the evidence shows the following facts:

During all relevant times, White was living in Cell 214, a single-man cell on the second floor of the north side of A Cellhouse (ACH). ECF 128-1 at 14-15. Around 11:00 a.m. on January 14, 2023, a fire started in cell A252, on the north side of ACH. ECF 112-1 at 22. The individual who lived in cell A252 was Michael Smith. *Id.* White's cell was approximately 17 cells away from cell A252. ECF 128-1 at 38. White and other inmates began banging on the metal property boxes in their cells to make noise and alert the officers about a cell being on fire. *Id.* at 25, 36, 43.

At around 10:58 a.m., prison staff heard the fire alarm in ACH go off and inmates yelling, prompting them to respond. ECF 128-11 at 2. Sgt. Walton called a 10-71, which is the signal for a fire in ACH. ECF 128-11 at 2; ECF 90 at 5-6. Officer Cross grabbed a fire extinguisher from the officer's station, and he and Officer Crockett went to the 200 North range with the fire extinguisher and the keys to the range. ECF 128-3 at 3; ECF 128-11 at 2. Once they were on the 200 range, they realized the location and size of the fire. *Id.* They proceeded to Cell A252, but it was hard to get near the front of the cell to manually unlock the door because of the intensity of the fire. *Id.* Officer Cross used the fire extinguisher but it was not able to put out the fire. ECF 128-3 at 3. Officer Cross had unknowingly grabbed a water-based fire extinguisher, and realized he needed an ABC fire extinguisher instead. *Id*.

Officer Cross then quickly went back downstairs and met Lt. Smith-Robinson, who handed him an ABC fire extinguisher. ECF 128-3 at 3; ECF 128-4 at 2. At approximately 10:59 a.m., Officer Cross returned to Cell A252 with the ABC fire extinguisher and passed it to Officer Crockett, who deployed it to control the fire. ECF 128-11 at 2; ECF 128-3 at 3. First responders arrived on the scene, including Lt. Koen. ECF 128-11 at 2; ECF 128-5 at 2. Lt. Koen was able to open the door to Cell A252 as staff continued to try to put out the fire. ECF 128-11 at 2; ECF 128-5 at 2. The inmate firefighters arrived on the scene and were able to extinguish the fire. ECF 128-11 at 3.

While the fire was ongoing, White testified that he was having difficulty breathing due to the smoke in the cellhouse, and he assumed he "blacked out" because he was on his bed and later woke up on the floor. ECF 128-1 at 39, 46-47. He did not

know how long he may have been unconscious. *Id.* at 47. He says his eyes were burning, he felt dizzy, he wanted to vomit, and he experienced shortness of breath, severe coughing, and a headache. *Id.*

Once the inmate firefighters arrived and began extinguishing the fire, Captain McCann authorized the evacuation of the remaining inmates in ACH. ECF 128-4 at 2. Correctional officers unlocked the cells and swept each range. *Id*. White's cell was opened, and he was able to go down the stairs to evacuate. ECF 128-1 at 51. Once he exited ACH through the front door, he stated "I need some help" and asserted he needed to go to medical because he could not breathe. *Id.* at 51-53. He directed this statement to everyone standing outside of ACH, which he believed included Case Worker Mayes, Lt. Koen, Sgt. Walton, and Lt. Smith-Robinson. *Id.* at 52-53. Officers Crockett and Cross were nearby getting water, and White did not know whether they heard him. *Id.* at 55.

White and the other inmates were escorted to the recreation building, while any inmate experiencing a medical emergency was taken directly to the medical services unit. ECF 128-5 at 3; ECF 128-6 at 2; ECF 128-1 at 51-53. White testified he conveyed his need for medical attention during the escort and reiterated his request once they arrived at the recreation building. ECF 128-1 at 51-56. He believed he requested medical attention from Sgt. Walton, who responded that she was doing a count. *Id.* He does not recall having any further conversations with the incident defendants while in the recreation building. *Id.* at 56-58.

After ACH was cleared, the inmates were returned to their cells and placed on lockdown. ECF 128-3 at 4; ECF 128-4 at 2. Lt. Koen and Lt. Smith-Robinson assisted in directing inmates back to their cells. ECF 128-4 at 2; ECF 128-5 at 3. White ran into Lt. Koen outside the cellhouse and asked whether they were going to get medical attention. ECF 128-1 at 57. Lt. Koen responded, "Later. Now lock in." *Id.* Lt. Koen attests that inmates who requested medical attention but did not appear to be experiencing an emergency were returned to their cells so staff could perform a triage and coordinate treatment with medical staff. ECF 128-5 at 3.

Once inmates were back in their cells, Lt. Smith-Robinson and other custody staff performed a count of the inmates and did rounds in the cellhouse, spoke with the inmates, and informed medical staff if any of them required assistance. ECF 128-4 at 3. White could not recall speaking with any of the incident defendants once he returned to his cell, though he testified that he requested medical request slips from an unknown person. ECF 128-1 at 60-62. Once he was back in his cell, he coughed a few more times and his eyes were "burning a little bit," but "it wasn't too much." *Id.* at 65. He put some water on his face, got another headache, and felt a little dizzy. *Id.* His lungs were still "burn[ing] a little bit," but he was "all right at that point" because he had "been outside for a few hours." *Id.* Prior to the fire, White had been experiencing regular headaches and dizziness which he believed was caused by high blood pressure. *Id.* at 98. He testified he could not "directly blame [those symptoms] on the fire." *Id.* At some point in time he was placed on blood pressure medication, which resolved his headaches and

dizziness. *Id.* It is unclear from the record whether White ever received any medical treatment for any symptoms related to the January 14 fire.

As discussed, White is proceeding against the incident defendants "for denying him medical care for injuries he suffered" during the January 14 fire. ECF 23 at 11. The incident defendants argue summary judgment is warranted in their favor on this claim because (1) White did not suffer any objectively serious medical condition, (2) they were not deliberately indifferent to that condition, and (3) they are entitled to qualified immunity.

Under the Eighth Amendment, prison officials have a duty to ensure inmates receive constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability for an Eighth Amendment violation, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendants acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the second prong, White must show the incident defendants "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks, brackets, and citations omitted). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*,

982 F.3d 451, 458 (7th Cir. 2020)). The deliberate-indifference inquiry is subjective: the defendant must be aware of facts supporting an inference that a substantial risk of serious harm exists and must actually draw that inference. *See Farmer*, 511 U.S. at 837; *Jackson v. Esser*, 105 F.4th 948, 961 (7th Cir. 2024).

White testified that, as he left ACH, he said he needed help and medical attention because he could not breathe. ECF 128-1 at 51-53. He repeated his request during the escort to the recreation building, while in that building, and before the inmates were returned to their cells. *Id.* at 51-58. At summary judgment, that testimony must be credited. But the evidence still must permit a reasonable jury to find that each defendant knew White faced a serious medical risk and consciously disregarded it.

White's testimony does not establish that Officers Cross or Crockett knew he needed medical attention. White directed his initial statement generally toward the people standing outside ACH. *Id.* at 52-53. Officers Cross and Crockett were nearby getting water, but White did not know whether they heard him. *Id.* at 55. White identifies no later interaction in which he informed either officer of his symptoms. Because there is no evidence that either officer was aware of White's request or otherwise knew he faced a serious medical risk, no reasonable jury could find that either consciously disregarded that risk.

The evidence likewise does not show deliberate indifference by Lt. Smith-Robinson or Case Worker Mayes. Even assuming they heard White's general request outside ACH, the inmates were then being evacuated from an active fire and escorted to the recreation building. ECF 128-1 at 51-55. Inmates who appeared to be experiencing a

medical emergency were taken directly to the medical unit, while White was able to walk down the stairs and proceed with the other inmates to the recreation building. ECF 128-5 at 3; ECF 128-6 at 2; ECF 128-1 at 51-53. White identifies no later conversation in which he alerted either defendant that his condition had worsened or required emergency intervention. On this record, their continued participation in the evacuation and securing of the inmates does not show the culpable state of mind required by the Eighth Amendment.

Sgt. Walton and Lt. Koen responded more directly to White's requests, but their responses do not permit a finding of deliberate indifference. White testified that Sgt. Walton responded that they were "counting" when he requested medical attention in the recreation building, and that Lt. Koen later told him, "Later. Now lock in." ECF 128-1 at 56-57. This was obviously an emergency situation. There had been a fire in the cell block, and the officers were attempting to quickly move the numerous prisoners to a safe location. In context, these responses deferred White's request while staff completed the count and returned inmates to their cells; they did not foreclose treatment. Lt. Koen attests that inmates who requested medical attention but did not appear to be experiencing an emergency were returned to their cells so staff could perform a triage and coordinate treatment with medical staff. ECF 128-5 at 3. Nothing in the record suggests that White outwardly appeared to require emergency intervention rather than that established process.

More generally, the Eighth Amendment did not require the incident defendants to abandon their responsibilities during the fire response to personally secure

immediate medical treatment each time White requested it. Staff had a procedure under which inmates who appeared to be experiencing medical emergencies were taken directly to the medical unit, while other inmates requesting care were first secured in their cells and then triaged so treatment could be coordinated. ECF 128-5 at 2-3; ECF 128-6 at 2. The incident defendants did not act with deliberate indifference by continuing the evacuation, count, and securing of ACH and directing White through the procedure established to address non-emergency medical requests. *See Hayes v. Zatecky*, No. 1:21-CV-00630-JPH-KMB, 2023 WL 5722673, at *5 (S.D. Ind. Sept. 5, 2023) (administrators were not required to personally secure treatment for non-emergency complaints where the inmate could seek treatment through appropriate medical channels) (*citing Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009)); *Robertson v. Liedtke*, No. 3:23-CV-514-HAB, 2026 WL 274603, at *4-5 (N.D. Ind. Feb. 2, 2026).

White's own description of his condition after returning to his cell further undermines an inference that the incident defendants consciously disregarded a serious medical risk. By then, he coughed only a few more times, his eyes and lungs were burning "a little bit," and he was "all right at that point" because he had been outside for several hours. ECF 128-1 at 65. He had no further conversations with any incident defendant after returning to his cell. *Id.* at 60-62. And although he experienced another headache and some dizziness, he had experienced those symptoms regularly before the fire due to what he believed was high blood pressure and could not directly attribute them to the fire. *Id.* at 65, 98. This evidence does not support a reasonable inference that

any incident defendant knew White continued to face a substantial risk of serious harm after he was secured in his cell.

To the extent White's claim rests on a delay or failure to obtain treatment, he also has not produced medical evidence that the lack of earlier care caused him additional harm. *See Barnes v. Wexford Health Sources, Inc.*, 177 F.4th 825, 833 (7th Cir. 2026) (when a plaintiff alleges delayed treatment, he must present verifying medical evidence that the delay, rather than the underlying condition, caused harm). It is unclear whether White ever received treatment for symptoms related to the fire at all, much less that there is evidence that earlier evaluation would have prevented additional injury or otherwise changed his medical outcome. *See Barnes*, 177 F.4th at 833; *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009).

Accordingly, even crediting White's testimony that he repeatedly requested medical attention, the evidence does not permit a reasonable jury to find that any incident defendant consciously disregarded a known, serious medical risk. Summary judgment is therefore warranted in favor of the incident defendants on this claim.

*b. Supervisory Defendants*

White is proceeding against the supervisory defendants on a deliberate-indifference claim based on the risk of harm posed by the January 2023 fire. There is no evidence that any of these defendants were present for or personally involved in responding to the January 14 fire. Rather, White's claim concerns their conduct before the fire: he contends that they knew conditions in ACH created a substantial risk of

serious harm in the event of a fire but failed to take reasonable measures to address that risk.

The supervisory defendants submit affidavits from ISP Safety Hazard Manager Taylor and Warden Neal describing the fire-prevention and response measures in place at ISP at the time of the January 14 fire. They attest to the following facts:

ISP maintains its own on-site inmate fire department, whose members receive statewide firefighter certification and training through the State Fire Marshal, allowing the facility to respond to fires more quickly than if it had to wait for an outside fire department. ECF 128-7 at 2. ISP also equips its fire department with the latest firefighting and smoke-control equipment, including foam backpack fire-suppression systems and smoke-evacuation systems. *Id.* All fire alarms were operational at the time of the January 14 fire, several had been newly installed or refurbished, and the dampers and exhaust systems in the cellhouses were regularly repaired and replaced as needed to ensure they remained operational. *Id.*

ISP had also implemented additional fire-safety measures following a 2017 fire. It purchased additional water and ABC fire extinguishers, which were placed at officers' stations and on the endcaps of each cell range; reduced the amount of property inmates could keep in their cells; and replaced plastic property boxes with more fire-resistant steel boxes. ECF 128-7 at 2-3. The housing units themselves are primarily constructed of steel and concrete, and ISP uses fire-retardant mattresses. *Id.* at 4. In 2019, ISP also upgraded all of its fire hydrants. *Id.*

These measures were supplemented by regular inspection, training, and emergency-planning procedures. The ISP Fire Department conducted bimonthly inspections of all fire extinguishers, and there were no reports of inoperable or empty extinguishers in ACH leading up to the January 14 fire. ECF 128-7 at 4; ECF 128-8 at 2. The Safety Hazard Manager and ISP Fire Department also conducted four fire drills per year for each building. *Id.* Finally, ISP maintained a Fire Plan setting out staff procedures for fire prevention and evacuation, and all staff received training on the plan and were required to complete a questionnaire testing their knowledge of those procedures. ECF 128-7 at 4-5; ECF 128-8 at 2.

All supervisory defendants attest they were unaware of any infrastructural issues or conditions at ISP that created a fire risk or threatened the lives of inmates living in ACH. ECF 128-2 at 1; ECF 128-7 at 6; ECF 128-8 at 4; ECF 128-9 at 3; ECF 128-10 at 2. The January 14 fire was investigated by both the State Fire Marshal and ISP's Internal Affairs Division, and neither party was able to determine the cause of the fire. ECF 128-7 at 7.

In his response, White lists twenty-five conditions he contends made ACH unsafe and created a substantial risk of harm in the event of a fire: (1) no inmate firefighters were housed in ACH; (2) fire signals were not called promptly; (3) staff did not promptly release inmate firefighters to respond to fires; (4) electrical outlets were not grounded; (5) the smoke-ventilation exhaust system was inoperable; (6) fire extinguishers were either inoperable or insufficient in number; (7) staff were inadequately trained; (8) automatic smoke alarms were inoperable; (9) the paint was

flammable; (10) staff training was deficient; (11) cells lacked emergency call buttons; (12) staff did not perform timely security checks; (13) cells had double-locking manual doors; (14) most fire extinguishers were water-based rather than ABC extinguishers; (15) staff cheated on fire-preparation questionnaires; (16) staff conducted sham fire drills; (17) there was no automated fire-suppression system; (18) the smoke-ventilation exhaust systems were not operational; (19) smoke detectors were positioned too high; (20) there were widespread problems with electrical outlets; (21) too few fire drills were conducted; (22) inmates were not provided storage containers with lids or covers; (23) staff failed to comply with recommendations made after the 2017 fire; (24) fire-safety equipment was not meaningfully inspected; and (25) staff were not properly questioned regarding their knowledge of fire-safety procedures. ECF 141 at 21-23.

In support of these arguments, White states that he "has provided a panoply of evidence," yet only has citations for four of the listed conditions. *Id.* And those sparse citations are largely lacking, or even contradict his assertions. For example, for his contention that there was no operational smoke ventilation exhaust systems, he cites *Jenkins v. Bass*, 2025 WL 1916106 (N.D. Ind. July 10, 2025), *reconsideration denied*, 2025 WL 2982380 (N.D. Ind. Oct. 23, 2025). He states that *Jenkins*, which was also about a fire in the prison, made the supervisory defendants aware that the exhaust system was inoperable. ECF 145-1, 23. But that is not what the case, which granted summary judgment to the moving defendants, stated. *Jenkins*¸ 2025 WL 1916106 at *4. Much the opposite, that opinion stated that the smoke was cleared "*using exhaust fans* and other fans brought to the unit." *Id.* at *2. At the summary judgment stage, I may disregard

unsupported factual contentions, and need not scour the record for any possible evidence that might be relevant to the plaintiff's contentions here. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) (holding that a court need not "scour the record in search of evidence to defeat a motion for summary judgment.").

Regardless, the question is not whether ISP could have done more; it is whether the supervisory defendants were deliberately indifferent to a substantial risk of serious harm. Deliberate indifference requires more than negligence or even objective recklessness. *Stockton*, 44 F.4th at 615. An official who takes reasonable measures to address a known risk is not deliberately indifferent merely because additional precautions were available or the measures taken ultimately proved insufficient. *See Farmer*, 511 U.S. at 844 (an official who responds reasonably to a known substantial risk cannot be held liable under the Eighth Amendment even if the harm is not ultimately averted); *Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (an official is not liable where the measures taken were "reasonably calculated" to address the risk, even though they ultimately failed to prevent the injury); *Bagola v. Kindt*, 131 F.3d 632, 647-48 (7th Cir. 1997) (officials who took reasonable steps to prevent harm were not deliberately indifferent even though they may have acted negligently or failed to eliminate the risk as quickly as possible). Thus, White cannot establish deliberate indifference simply by identifying additional fire-safety measures that ISP could have implemented.

Here, the undisputed evidence shows that the supervisory defendants took numerous steps "reasonably calculated" to address the risk posed by a fire. *See id.*

Before the January 14 fire, ISP had: (1) established an on-site inmate fire department whose members received statewide firefighter certification; (2) repaired and replaced dampers, exhaust systems, fire alarms, and fire extinguishers as needed; (3) purchased updated firefighting equipment, including foam backpack fire-suppression systems and smoke-evacuation systems; (4) purchased additional water and ABC fire extinguishers; (5) reduced the amount of property inmates could keep in their cells; (6) replaced plastic property boxes with more fire-resistant steel boxes; (7) upgraded its fire hydrants; (8) regularly inspected its fire extinguishers; (9) conducted fire drills four times per year; (10) implemented a Fire Plan governing fire prevention and evacuation; and (11) trained and tested staff on that plan.

White lists various ways in which he believes these precautions were inadequate or could have been implemented more effectively. But as I noted above, the Eighth Amendment did not require the supervisory defendants to eliminate every conceivable fire hazard or adopt every additional precaution that might have reduced the risk further. The undisputed evidence instead shows a substantial system of fire prevention, firefighting, evacuation, inspection, and training measures directed at the very risk White contends the defendants ignored. That those measures did not prevent his exposure to smoke during the January 14 fire does not permit a reasonable jury to conclude that the supervisory defendants exhibited "a total unconcern" for his safety. Summary judgment is therefore warranted in favor of the supervisory defendants on this claim.

Accordingly, for these reasons, summary judgment is warranted in favor of all state defendants on both of White's claims.

**II. Dr. Chico**

White is proceeding against Dr. Chico on an Eighth Amendment claim that she was deliberately indifferent to his need for medical care following the January 14 fire. ECF 23 at 11. Dr. Chico moves for summary judgment, arguing that the evidence does not permit a reasonable jury to find that she was deliberately indifferent to any serious medical need. ECF 130; ECF 131.

Dr. Chico provides an affidavit in which she attests to the following facts: During all relevant times, Dr. Chico worked at ISP as a psychologist providing mental health services to inmates. ECF 131-1 at 1. She was not scheduled to work on January 14, 2023, but was called after the fire in ACH and asked to come to the prison to check on the inmates' mental health. *Id.* at 2. By the time she arrived, the fire had been extinguished. *Id.* Dr. Chico spent the next four or five hours walking each range of ACH and checking on each inmate, including White. *Id.* She reminded inmates that she was available for mental health counseling, and several inmates who requested follow-up mental health treatment were scheduled for appointments. *Id.*

Because Dr. Chico is a psychologist rather than a medical doctor, she did not evaluate inmates for specific medical treatment during these rounds. ECF 131-1 at 2. If an inmate requested medical care, however, Dr. Chico attests that she recorded the inmate's cell location on a list and provided the list to custody staff so the inmate could be taken to the medical unit. *Id.* at 2-3. She did not have authority to personally escort

inmates to the medical unit. *Id.* at 3. Dr. Chico does not specifically recall whether White requested medical care when she spoke with him, but she attests that, if he did, she would have included his cell location on the list provided to custody staff. *Id.* She further attests that she observed no inmate displaying obvious signs of a medical emergency and believed that inmates who requested treatment would be taken to the medical unit. *Id.* After completing her rounds and providing her list of cell locations to custody staff, Dr. Chico left the prison. *Id.*

For purposes of summary judgment, I accept White's account that he requested medical attention when Dr. Chico spoke with him during her rounds and informed her of the symptoms he attributed to smoke exposure. ECF 143-1 at 9. But White does not identify evidence that he outwardly appeared to be experiencing a medical emergency. Indeed, he testified that, after spending several hours outside, he was "all right at that point," with only some additional coughing and mild burning in his eyes and lungs. ECF 128-1 at 65.

On these facts, Dr. Chico's response does not permit a reasonable inference of deliberate indifference. She attests that she recorded each request for medical care and provided the resulting list of cell locations to custody staff so those inmates could be taken to the medical unit for evaluation. ECF 131-1 at 2-3. The Eighth Amendment did not require her to personally perform every step necessary to secure treatment where she reasonably referred the matter to prison employees responsible for arranging access to the medical unit. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). Providing White's request for

medical attention to custody staff therefore does not exhibit "a total unconcern" for his welfare.

The uncertainty about whether White ultimately received treatment does not create a genuine dispute about Dr. Chico's conduct. White has no personal knowledge of what Dr. Chico did after leaving his cell, and he offers no evidence contradicting her testimony that all requests for medical treatment were recorded and delivered to custody staff. ECF 131-1 at 3. The fact that White may not later have been taken to the medical unit would show, at most, that a breakdown occurred somewhere in the multi-step process; it would not establish that Dr. Chico failed to relay his request or consciously chose to prevent him from receiving care.

Moreover, even if a reasonable jury could infer that Dr. Chico failed to include White's cell location on the list, there is no evidence that any such omission amounted to deliberate indifference rather than negligence. Nothing in the record suggests that Dr. Chico intentionally withheld White's request, deliberately omitted him from the list, or otherwise consciously chose to prevent him from receiving medical care. Thus, even assuming some breakdown attributable to Dr. Chico occurred, the record would permit only speculation as to whether it was inadvertent or reflected the culpable state of mind required for an Eighth Amendment violation. *See Barghouti v. Hansen*, No. 24-2610, 2026 WL 2169044, at *3 (7th Cir. July 28, 2026) (a subsequent delay in treatment did not establish who was responsible for the breakdown or that it resulted from deliberate indifference).

Third, the lack of evidence that any delay harmed White provides an additional reason his claim cannot proceed. When a claim rests on delayed rather than denied treatment, the plaintiff must present verifying medical evidence that the delay itself caused additional harm. *See Barnes*, 177 F.4th at 833. White has produced no medical evidence that earlier evaluation would have alleviated his symptoms sooner, prevented additional injury, or otherwise changed his medical outcome. His own testimony instead indicates that the symptoms he attributed to the fire had largely subsided by the time he returned to his cell. ECF 128-1 at 65.

Accordingly, even accepting White's testimony that he informed Dr. Chico of symptoms requiring medical attention, there is no nonspeculative evidence that Dr. Chico consciously disregarded that need or caused a harmful delay in treatment. The only competent evidence addressing what she did after speaking with the inmates shows that she recorded requests for medical care and provided the resulting list to custody staff, and White has produced no evidence from which a reasonable jury could find either that she failed to do so in his case or, even if she did, that the omission was anything more than negligent. Summary judgment is therefore warranted in Dr. Chico's favor.

For these reasons, the court:

(1) GRANTS the state defendants' motion for summary judgment (ECF 127);

(2) GRANTS Dr. Chico's motion for summary judgment (ECF 130); and

(3) DIRECTS the clerk to enter judgment in favor of the defendants and against Kory A. White, and to close this case.

**SO ORDERED**.

ENTERED: September 23, 2026.

/s/Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT